IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JACQUELINE SAMPSON, | : | CIVIL ACTION |
| | : | NO. 20-1719 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| FELICIAN SERVICES, INC., | : | |
| | : | |
| Defendant. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                    DECEMBER 7, 2021


Presently before the Court is the motion for summary
judgment filed by Defendant, Felician Services (doing business
as St. Ignatius Nursing and Rehab) ("St. Ignatius"). Plaintiff,
Jacqueline Sampson, asserts claims against St. Ignatius for: (1)
retaliation in violation of the Age Discrimination in Employment
Act, 29 U.S.C. § 621 et seq. ("ADEA") and the Pennsylvania Human
Relations Act, 43 P.S. § 951 et seq. ("PHRA"); and (2) national
origin discrimination in violation of Title VII of the Civil
Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII") and
the PHRA. Sampson is a sixty-year-old African American woman who
claims her national origin is "American." For the reasons that
follow, the Court will grant Defendant's motion.

I.     **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**[1]

Sampson began working at St. Ignatius as a licensed practical nurse ("LPN") in 2015 during which time the director of Nursing was Madingo Dweh, who is from Africa. When Dweh left in June 2018, she was replaced by Mia Carter, who is African American.

Sampson and Carter had previously worked together at Maplewood Nursing and Rehabilitation Center ("Maplewood"), where Carter was director of nursing. After Sampson's employment at Maplewood was terminated in 2013, Sampson brought an age discrimination suit against Maplewood and, in the complaint, alleged that Carter had harassed her and fired her due to her age. Sampson and Carter had no further contact until Carter started working at St. Ignatius, and they had very limited contact thereafter.

On December 24, 2018, Sampson, Miriam Dukuray, an LPN who is from Africa, and Anie Mittathanym, a registered nurse who is from India, had a loud argument over who should complete a certain task. The argument was near the nurses' station and was overheard by others, including a co-worker, Dionne Fleming who

---

[1]     The Court views the facts in the light most favorable to Plaintiff, the non-moving party in this case.

is African American. According to Dukuray's statement,[2] Sampson
stated to her during the argument: (1) "you wait, you will see
how much longer you will be in America[]. They are going to ship
you all back to where you came from," and (2) "we have a new
Sheriff in town and she is not here for Africans like Madinga
[Dweh, the former director of nursing,] did." Def. Mot., ECF No.
24-14. Dukuray also stated that Sampson "continue[d] to carry on
that we Africans come here with voodoo and think we are
somebody." Id.

    According to Mittathany's statement, Sampson said during
the argument that, "I am born and brought up in America and I
speak correct English and I have no accent. I understand the
English well," and that Sampson "kept on saying the same very
loudly at the nurse's station." Def. Mot., ECF No. 24-16.

    Fleming reported in her statement that Sampson said to
Dukuray "see how much longer you stay here before you get put

---

[2]    Sampson objects to the Court considering several witness
statements that were taken as a part of an investigation into
the incident, claiming they are hearsay statements. However, the
Court is not considering the statements for the truth of the
matter asserted therein, but considers them in the context of
whether, in light of the statements, Defendant's actions were
such that they could or could not create an inference of
retaliation or discrimination. Thus, the statements are not
hearsay. See Fed. R. Evid. 801(c)(2); see also Keller v. Orix
Credit All., Inc., 130 F.3d 1101, 1109 (3d Cir. 1997) ("The
question is not whether the employer made the best, or even a
sound, business decision; it is whether the real reason is
[discrimination].") (quoting Carson v. Bethlehem Steel Corp., 82
F.3d 157, 159 (7th Cir. 1996)).

back on the boat to Africa," and that "it's a new sheriff in town." Def. Mot., ECF No. 24-15.

Sampson provided in her own statement that she told Dukuray, "that's ok we have a new sheriff in town," Def. Mot., ECF No. 24-13, and later testified that she meant that Dweh was the old sheriff,[3] and that Carter was the new sheriff. However, Sampson denied making any discriminatory remarks about Africans or that her statement regarding the new sheriff was meant to have any discriminatory meaning.

Immediately after the dispute, Sampson sought out and met with Carter and Bob Gilbert, the head of human resources, to complain about Dukuray's conduct. Carter and Gilbert stated that they would investigate Sampson's claim. Gilbert then investigated the incident and obtained the statements described above. Ultimately, Gilbert concluded that Sampson's conduct, and not Dukuray's, warranted termination.

When Gilbert started his investigation, Carter told him that she had worked with Sampson at a previous job and that she did not want to be involved in the investigation. In her sworn statement, Carter provides that she did not participate in the investigation, did not recommend any discipline to Gilbert, and that Gilbert alone made the decision to terminate Sampson.

---

[3]    Sampson also testified that she believed Dweh had favored other Africans when Dweh was director of nursing.

4

Gilbert testified to the same, and also testified that he made the final decision to terminate Sampson after Carter had left on vacation. However, Gilbert additionally testified that he discussed the situation with Carter before she left on vacation and that Carter completed the top portion of Sampson's disciplinary action notice, including the reason for termination.

Sampson's disciplinary action notice states the reason for her termination as: "Rude & Discourteous Behavior. Employee was involved in a verbal dispute with another employee. Following this dispute, employee made multiple racially driven statements towards employees that were of African descent." Def. Mot. ECF, No. 24-4.

On January 9, 2019, Gilbert as well as M. Valentine (Sampson's union representative) and Denise Bonanni (the acting director of nursing)[4] met with Sampson to present her with the disciplinary action notice. Sampson refused to sign it and left the meeting shortly after it began. Bonanni and Valentine signed the notice and Gilbert terminated Sampson's employment.

Separately, on January 11, 2019, Dukuray was issued a disciplinary action notice signed by Carter. Dukuray was given a warning for "engag[ing] in a verbal dispute with employee at

---

[4]    Bonanni was acting director because Carter was on vacation.

nurses' station," was sent to undergo "[r]emediation with Sister Veronica," and was instructed to "refrain from verbal disputes with coworkers. When disagreements arise, employee must walk away and immediately notify unit [manager]/supervisor/DON." Def. Mot., ECF No. 24-18.

Gilbert testified that he had determined that Dukuray participated in the confrontation, but found "no evidence of abusive language, racial slurs, or shouting" by her. Gilbert Dep. at 81, ECF No. 24-12 at 21. In contrast, Gilbert testified that he found that Sampson was loud and "used racial slurs towards Africans. . . ." Id.

Sampson filed a race and national origin discrimination and retaliation complaint with the EEOC on January 22, 2019. After the EEOC dismissed the complaint and issued a right to sue notice, Sampson filed this case.

## II. LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). A

fact is material if proof of its existence "might affect the
outcome of the suit," and a dispute is genuine if "the evidence
is such that a reasonable jury could return a verdict for the
nonmoving party." Anderson, 477 U.S. at 248.

The Court views the facts "in the light most favorable to
the nonmoving party." Am. Eagle Outfitters, 584 F.3d at 581.
"After making all reasonable inferences in the nonmoving party's
favor, there is a genuine issue of material fact if a reasonable
jury could find for the nonmoving party." Pignataro v. Port
Auth. of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010). While
the moving party bears the initial burden of showing the absence
of a genuine issue of material fact, meeting this obligation
shifts the burden to the nonmoving party who "must set forth
specific facts showing that there is a genuine issue for trial."
Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)
(1963)).

## III. DISCUSSION

### A.   Retaliation Under the ADEA and PHRA (Counts I & III)

Sampson contends that Carter, St. Ignatius' director of
nursing, retaliated against her because in 2014 Sampson filed an
age discrimination case against her former employer, Maplewood,
where Carter was, at that time, director of nursing. While
Carter was not a named defendant in the 2014 complaint against
Maplewood, Sampson alleged in the 2014 complaint that Carter

7

harassed her while at Maplewood and fired her because of her
age. Sampson now claims that Carter retaliated against her for
filing the 2014 suit by having her fired from St. Ignatius in
2019. Sampson's ADEA and PHRA retaliation claims feature the
same analysis. Daniels v. Sch. Dist. of Phila., 776 F.3d 181,
192–93 (3d Cir. 2015).

Because Sampson's claims rely on indirect evidence, their
analyses follow the McDonnell Douglas burden-shifting framework
under which a plaintiff must first establish a prima facie case
by showing: "(1) [that she engaged in] protected employee
activity; (2) adverse action by the employer either after or
contemporaneous with the employee's protected activity; and (3)
a causal connection between the employee's protected activity
and the employer's adverse action." Id. at 193 (quoting Marra v.
Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007)).

If the plaintiff makes this showing, the burden of
production shifts to the employer "to present a legitimate, non-
retaliatory reason for having taken the adverse action." Id. "If
the employer advances such a reason, the burden shifts back to
the plaintiff to demonstrate that 'the employer's proffered
explanation was false, and that retaliation was the real reason
for the adverse employment action.'" Id. (quoting Marra 497 F.3d
at 300). While "the burden of production of evidence shifts back
and forth, the plaintiff has the ultimate burden of persuasion

at all times." <u>Id.</u> Moreover, the plaintiff must ultimately prove
"that the desire to retaliate was the but-for cause of the
challenged employment action." <u>Univ. of Texas Sw. Med. Ctr. v.
Nassar</u>, 570 U.S. 338, 352 (2013); <u>see also</u> <u>Gross v. FBL Fin.
Servs., Inc.</u>, 557 U.S. 167, 176 (2009) (providing that ADEA
claims require "but-for" causation).

The Court concludes that Sampson has likely made a prima
facie case because: (1) she filed an age discrimination
complaint against Maplewood, which is a protected activity; (2)
she was fired from St. Ignatius, which is an adverse action; and
(3) there is arguably a causal connection between the two given
Carter's alleged involvement in her firing from Maplewood and
the somewhat unclear testimony regarding her involvement in
Sampson's firing from St. Ignatius.[5]

---

[5]    There are some troubling aspects regarding Sampson's prima
facie retaliation case that the Court need not address in depth
given its ultimate conclusion regarding pretext.

First, the parties dispute whether the four-plus years
between Sampson's protected activity and her termination from
St. Ignatius is temporally suggestive of a retaliatory motive.
Sampson contends that it is since she alleges that Carter had no
opportunity to retaliate against her until Carter started
working at St. Ignatius with Sampson in the summer of 2018. The
Court questions whether, under the circumstances presented here,
any retaliatory motive can be attributed to Carter and imputed
to St. Ignatius after this lengthy interval.

Second, and not raised by the parties, the Court questions
whether liability for one individual's retaliation based on
events that occurred in connection with a previous employer can
be imputed to a subsequent employer who is unaffiliated with the
previous one and may be unaware of the earlier retaliation-

In turn, St. Ignatius has met its burden of providing a legitimate reason for Sampson's termination: that she "made multiple racially driven statements towards employees that were of African descent." Def. Mot., ECF No. 24-4. At the final step, however, Sampson fails to show that St. Ignatius' stated reason for her termination was a pretext for Carter to retaliate against her.

In this case, Gilbert, the head of human resources who investigated the incident, obtained statements and testimony from multiple individuals with direct knowledge that Sampson used racist language during the December 24, 2018 argument, and also obtained a partially corroborating statement from Sampson. Gilbert's testimony that such conduct would always result in termination has not been contradicted. Whether the statements are ultimately true is of no moment. What is important is that it was within the realm of reason for Gilbert to have relied and acted upon such evidence and that, based on that evidence, dismissal would be proper. Keller, 130 F.3d at 1109.

In the presence of this evidence, no reasonable jury could conclude that "but-for" Sampson's protected activity, she would not have been terminated. Indeed, Gilbert's undisputed testimony

---

causing protected action. The Court notes that all of the allegations of retaliation are levelled at Carter, who is not a named defendant in this case. The only named defendant is St. Ignatius.

is that any employee would have been fired under the circumstances. Therefore, summary judgment is warranted on Sampson's claims of retaliation.

### B.   National Origin Discrimination (Counts II and IV)

Sampson claims that Dukuray, who is from Africa, was treated better than Sampson, who is from the United States. Because of that disparate treatment, Sampson claims that St. Ignatius discriminated against her on the basis of her national origin.

Sampson's Title VII and PHRA national origin discrimination claims also follow the McDonnell Douglas framework. A plaintiff establishes a prima facie case of national origin discrimination by showing that: (1) she is a member of a protected class; (2) she is qualified for the position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances that give rise to an inference of unlawful discrimination. Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410-11 (3d Cir. 1999).

There is no real dispute regarding the first three factors, so the Court will only discuss the fourth causation factor.[6]

---

[6]     Moreover, few of Sampson's arguments regarding her discrimination claim have any connection to national origin, and instead, are better considered as part of her retaliation claim. The Court will discuss in this section those arguments that do touch on national origin.

Sampson argues that Dukuray was treated more favorably than
Sampson because Gilbert interviewed Dukuray but not Sampson
about the December 24, 2018 incident, and because Dukuray
received a lighter punishment than Sampson. Sampson argues that
this favorable treatment gives rise to an inference of unlawful
discrimination based on national origin. The Court disagrees.

While Gilbert did interview Dukuray, that fact makes no
difference in the analysis given that both Sampson and Dukuray
submitted written statements which provided their respective
version of the facts. Moreover, it is undisputed that there is
no evidence that Dukuray uttered racist language, which was the
primary basis for Sampson's termination. In other words, the
fact that Dukuray was not terminated is not probative of
discriminatory conduct since Dukuray was not accused of the type
of extreme conduct which formed the basis of Sampson's
termination. In that Sampson has failed to establish
circumstances that would give rise to an inference of unlawful
discrimination, she has failed to make out a prima facie case.

In the alternative, even if Sampson had made out a prima
facie case, she has not shown that St. Ignatius' stated reason
for her termination was a pretext for discrimination. Jones, 198
F.3d at 410. Gilbert relied on the statements of the
participants and witnesses and reasonably concluded that Sampson
had made racist comments to Dukuray. No rational jury could

12

conclude from the evidence that St. Ignatius' reason for terminating Sampson's employment "was not merely wrong, but that it was 'so plainly wrong that it cannot have been the employer's real reason,'" and instead, Defendant was driven by national origin animus. Id. at 413 (quoting Keller, 130 F.3d at 1109). Therefore, Sampson's national origin discrimination claims must also fail.

## IV.  CONCLUSION

For the reasons set forth above, the Court will grant St. Ignatius' motion for summary judgment, and enter judgment in its favor.

An appropriate order follows.